Case number 233630, Parents Defending Education v. Olentangy Local School District Board of Education et al. or argument not to exceed 15 minutes per side. Mr. Connolly for the appellant. The Supreme Court has long recognized that students do not shed their constitutional rights to freedom of speech at the schoolhouse gate. Just two terms ago, in a near unanimous opinion by Justice Breyer, the Supreme Court in Mahanoy reiterated these principles. The Court said that America's public schools are the nurseries of democracy, and our representative democracy only works if we protect the marketplace of ideas. Schools, therefore, cannot limit speech unless they satisfy a demanding standard. But the District Court here relieved the Olentangy School District of its burden. The District Court held that schools can always punish students who do not use another student's preferred pronouns because this speech always causes harassment and thus always causes substantial disorder. That holding was wrong. Let me ask you, counsel, on that tinker standard that you're raising here. Didn't parent members of this litigation say that they understood that being referred to by non-preferred pronouns would make transgender students feel insulted, humiliated, and dehumanized? Isn't that then the use of non-preferred pronouns is likely, in the tinker words, to substantially disrupt the educational process for transgender students based on the statements of your own clients? I don't believe so, Your Honor. What our parents said is that the children understood that under the policies it could be, that the school will interpret it as dehumanizing, as insulting, that sort of thing. They are discussing the over-breath. I thought the statement was that some of your parent members stated that they understood that being referred to repeatedly by non-preferred pronouns would make transgender students feel insulted, humiliated, and dehumanized. Is that incorrect under 7-3, record 7-4, record 7-6? I can pull up the records and double check them. But my understanding is that what the parents were saying is that they understood, that was there for standing purposes. And what they were saying is they understood that they will be punished for their speech because the school will interpret what they are saying as dehumanizing, as insulting, that sort of thing. The parents and the students believe that these are their First Amendment rights. And even if the students do find, the other students do find it dehumanizing and that sort of thing, that is just offensive speech. And the Supreme Court has said over and over and over again that just because speech is merely offensive does not mean that the school has the right to punish the speech. But isn't the question in the school context, under the Tinker Standard, whether the repeated use of non-preferred pronouns is likely to substantially disrupt the educational process? Isn't that the standard here? The standard is whether the student's speech is, whether the school's concluded that it is reasonably likely to lead to substantial disorder. So that is what the district court below relied on. But the school here on appeal has abandoned that. They don't make that argument once. And the reason they don't make that argument is they didn't put a single thing in the record, I assume why they are not making the argument, is they didn't put a single thing in the record showing one instance in which there was substantial disorder from one use of intentional, of pronouns. And the point of the over breadth doctrine, and this is I think is the best and the easiest way to resolve this claim, or this case, is that the point of the over breadth doctrine is that just because you have the power to restrict some speech doesn't mean that you can write a broad sweeping policy that restricts all sorts of protected speech. And so if the school is allowed to do that, but what they can't do is what they did here, which is just write a sweeping policy that says that at all times nobody can ever use pronouns that are not preferred by another student. So is what you are saying, Mr. Connolly, is that the school was required to wait until it had amassed a number of instances of actual disruption before it could demonstrate that it would substantially disrupt the educational environment? No, that's not correct. But they needed to come to a reasonable conclusion with evidence of predicting that this would happen. So in Barr, for example, and Castorina's, two of the Confederate flag cases, the court made clear they don't have to wait for actual disruption. They can make a reason. It's common sense, correct? Well, they can use, they can use, they need to focus on things that have actually happened at the school. But again, even if you see that, the standard here is tinker. The standard here is harassment under Davis, for example. You can't just write a policy that blanketly forbids this. Because, for example, the way the policy is written right now, the way that they've interpreted, a single use of a pronoun that somebody else finds offensive, one use, is enough to be punished. So a student talking to a teacher... Is that what the school said in response to the request from one of your clients? That is what they said, and that's what their position on this, in this case, has been. Yes, there is no severity requirement, there is no repeated, and there's no requirement that it be repeated over and over again. Could you get to the very specifics of which policy you're talking about? Because my understanding of the record is not, it doesn't comport with Fiddick's argument. My understanding was there was a request, there was a response to that, that we, that our policy forbids harassment. If you have a religious objection, we will speak with you about an accommodation. We're looking at 5517, an anti-harassment, we're looking at 5136, we're looking at the Code of Conduct provision, all of which have slightly varied concepts, and my understanding was that you were making arguments under compelled speech, over breadth doctrine also, but that what we are here on is your pre-enforcement case brought, and for example, in this preliminary injunction function, it's your burden to show over breadth. It's not the school's burden to show it's yours, because of the situation. I understand you're citing to a number of other cases, but many of those are summary judgment cases, and we are here on pre-enforcement. So tell me with some particularity how your argument works. Correct. These are facial challenges, and I would point the Court also to the ACLU brief, which really lays these arguments nicely and goes policy by policy. But the two points I'd like to make. First, what the school said in its email is broad and sweeping. It says a student purposely referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under board policy. Second, what they have said is that in this litigation, they've confirmed that the policies we've challenged always prohibit any use of pronouns that is not preferred. And the third thing I would point to is, and this is the easiest one, is the Code of Conduct prohibits discriminatory language. This is on page ID 150. It says students may not use discriminatory language, which is anything that is derogatory towards an individual or group based on one or more of the following characteristics. Again, the ACLU provides a long list of examples of ways in which this is over broad. And the same thing... Let's get back to your statement that they could not use gendered references. Doesn't that fall under your compelled speech argument? Is that they are compelled to speak against their beliefs? That's your argument in the brief. I'm trying to understand where we are. You talked about tinker, substantial disruption, and now the compelled speech issue. Tell me why this is compelled speech. Sure. So we have three claims. What I've been speaking about to begin with is the over breadth claim. The second claim is our compelled speech claim. And our argument here is that when you impose a policy that says at all times you must use certain pronouns, it is compelled speech. And the district court below agreed that the policy compels speech. But what the district court said is that this is fine because it's reasonable. And that's really a dangerous policy. If we are looking at it from the standard where you are in this pre-enforcement case, then don't we consider the precedent in Meriwether that accommodations are not necessarily that would allow someone to use the person's name or to refer to them not by their preferred pronouns. I'm not saying that there is compelled speech here because Meriwether itself says this proposal is a win-win. Meaning that the individual students do not have to use their first or last name. They are not compelled to use somebody else's preferred pronouns. They may use their first or last name. Meriwether discusses accommodations, the facts of that case. But the opinion did not at all turn on whether there were accommodations being given. Meriwether says that the use of pronouns expresses a viewpoint. And Meriwether also rejected the university's argument that you can always impose a pronoun policy because it's needed to prevent discrimination based on gender identity. And what Meriwether did is it looked at the facts of this case and the court said, looking right here, that the university hasn't proved their burden and so it can't do what the school has done here, which is just do a blanket prohibition on a certain type of speech, on content. Good morning. May it please the court, my name is Bartholomew Freese. Here today on behalf of Appellees, the Olentangy Local School District Board of Education as well as its board members and employees who have been named in this lawsuit. Judge Strange, I'd like to start by answering the question that you asked counsel about whether the parents had understood that the speech would be considered insulting, humiliating, dehumanizing, derogatory and unwanted by those who want to go by different pronouns. The answer to that is yes. It's found all of the instances, but if you look at page 76, it talks about parent A's child understanding that and paragraph 96 of the complaint talking about parent B's children understanding that. Something that I'd like to address as well was a comment made by counsel that a single use of misgendering an individual will be considered a violation of the policy. I believe the term always was used in succession. That's simply not true. That misreads the policy. To begin with, it would require intentional misgendering. Second, there could potentially be accommodations as has been made clear here. What are the proposed accommodations? Well your honor, that's a good question because as we are here on pre-enforcement, we have never had an instance since 2013 when these gender identity protections were added of having a student request an accommodation or be punished under this policy. I think certainly if you look at Meriwether, one of the accommodations there would be to call a student by the last name. I think there are other potential accommodations that the district would be willing to work with students to adjust. I think something to keep in mind here too is one, we are aware of 50 transgender students in our school district and I believe there are 23,000 students in total. This presumes one, that these folks are coming into contact with one another and two, it presumes that the folks who want to use pronouns consistent with an individual's biological sex actually know what that biological sex is. I think something that is overlooked here is there is a desire on the part of plaintiff to use pronouns consistent with biological sex based on genetics or genitalia primarily, but it's unclear how any particular student would know any other particular student's genetic information or appearance of genitalia in almost all circumstances. So to get back to your question... So kids in elementary school don't know that the kid they are playing kickball with is actually just like them, namely a boy or actually like your sister, namely a girl. I mean kids don't know these kinds of things or have a pretty good idea, is that what you are saying? Well, your honor, they may have a good idea, but if we are limiting the concept of biological sex specific to genetics or genitalia appearance, then no, that would not be something that a typical grade schooler would know. They may see that someone appears to be a boy or appears to be a girl in a traditional sense, but that in no way proves scientifically that someone is or is not a boy or a girl. To get back to your point about accommodations in Meriwether, I think something to keep in mind about the distinction between Meriwether and this case is first and foremost Meriwether was a case that involved a university. We are dealing here with a K-12 context and it is well recognized that in the K-12 context, first amendment protections are not as broad as they are in the university context and the reason for that is there are certain things that a district needs to do in order to ensure the orderliness of the operation. There is also the distinction between K-12 versus university situation where a particular student is a captive audience essentially in the K-12 context. They don't have a choice whether or not to go to school. Some families, if they have the means or have the opportunity, may take their children out of public school and educate them otherwise, but the vast majority of children are subject to attending their public school and for that reason there are certain leeway provided to a public school district in the K-12 setting that wouldn't be available in Meriwether. Some other distinctions between Meriwether and this case, Meriweather involved an employee's religious rights and an employee's freedom of expression and specifically the freedom of expression in a university setting that his class was a political philosophy class in which those types of discussions were, if not prevalent, regular and a part of the core curriculum of what he was doing. None of those can be said. Well, the standard relates to disruption, right? In this elementary school, in the undergraduate or outside college context, it's the Tinker Standard that we discuss. Is that correct? That's correct, Your Honor, and I think there are three primary types of speech that can be circumscribed under the Tinker Standard. The first is speech that puts someone in a view that they may suffer personal injury or threat to their property damage. The second is the type of speech that may substantially disrupt the educational process and the orderly operation of the school district. And the third is the substantial impact to a student's educational benefits, opportunities, and progress. And I think we would certainly argue that a student that is suffering discrimination, specifically harassment and bullying as it is defined in our policies, would have their opportunities, benefits, and progress impacted by that harassment. Your briefing argues that even if the policies are viewpoint-based restrictions, they comport with Tinker. But I read Barr as making it clear that the policies must both comply with Tinker and be viewpoint-neutral. What is your argument as to why these policies are viewpoint-neutral? Sure, Your Honor, I appreciate that. If you look at the policies on their face, they are neutral on their face. In fact, they are largely borrowed from the Tinker Standard and other federal laws. These are not created in a vacuum. There is no viewpoint distinction here. A student who is harassed under the Tinker Standard or any of the other protected classes would be entitled to protection. So for instance, if an individual wanted to wear a shirt that said, gender is fluid, and someone was harassing them, again, under the definitions of the policy, or if they were transgender and harassed for that, they would be entitled to protections. In the same vein, if someone had a different perspective, for instance, plaintiff's children who, or excuse me, plaintiff's members' children, who believe that their religion dictates that they believe sex is immutable, and those children were harassed under the definition of the policy, they would also be entitled to protections. This policy is not pro one type of student versus the other, nor does it seek to elevate the rights of one student over another. The purpose of the policy is to prevent harassment of students, not just for merely offensive language as counsel suggested, but if you look at the definitions, there are specific terms including requirements of severity and pervasiveness, and oftentimes repeat situations that require protection. What I believe that plaintiff is seeking is essentially a carve out, where all students are protected from harassment under that policy except for transgender students who are harassed because they are transgender. That in itself would be a viewpoint discrimination perspective, if the district protected everyone but transgender students, but again this policy is designed specifically to protect all students, and ultimately the purpose of that is because when you get back to Tinker, if you have harassment of students, that creates a substantial disruption in the ability of the school district to educate its students and protect their well-being, but it also impacts negatively the ability for the students who are being harassed, and even perhaps those around them, to experience the proper level of educational benefits and opportunities. Let's recall, so under our bar case that we've been discussing, your response is that it's permissible content-based regulation, not viewpoint. Correct, your honor, and I think when we're dealing with bar, I think that you've seen situations where if there are race relations and things of that nature, that schools have been able to limit the types of speech or potentially limit the types of speech that potential problems that may arise from, for instance, what they might call racially charged insignia. For instance, bar deals with the confederate flag, there are other cases that deal with the confederate flag, as well as Malcolm X insignia on t-shirts, the idea being that a school district may be able to create a situation where, for example, a student may be able to create a situation where, if it does not limit that speech, it is thereby allowing a substantial disruption and or potential disruption of a particular student's educational benefits. So how do you respond to counsel's argument that the district hasn't provided any evidence of substantial disruption or maybe the potential for substantial disruption? Well, your honor, there's been no substantial disruption from what I'm aware of because there has been no instance of enforcement of this policy in relation to gender identity. Wait, you're saying that the enforcement of the policy would cause the substantial disruption? Well your honor, I'm unaware of anyone violating the policy so that it would need to be enforced. So there's kind of no evidence of any substantial disruption, because surely you don't think that there's never been an instance of a misuse of a pronoun? Well your honor, nothing that has been brought to the attention of the district as far as I'm aware. Would you kind of indicate maybe that there's not a potential for substantial disruption by the use of wrong gendered pronouns? Well your honor, I would disagree that a school district must wait for a substantial disruption to occur in order to prescribe speech. I think the case law would prove that out here. The purpose of these policies and their application is not to subsequently punish individuals after the fact, but rather to provide information and a structure for the enforcement of the anti-harassment policies throughout the district, so hopefully a substantial disruption does not occur in the first place. What's your best case supporting that point that you'd like to point us to? Your honor, I would have to submit something additional to the court in order to give you a citation. Excuse me, my co-counsel just provided me a citation, Tuminello vs. Father Ryan High School. I don't have the specific case number, your honor. And that's a Sixth Circuit case that recognized that bullying can be reasonably forecast to lead to self-harm or suicide. In other words, that the district need not wait for the harassment to occur and the negative effects to occur in order to enforce an anti-harassment policy, your honor. Seeing as my time is winding down, I'm happy to answer any other questions and if there are no further questions, I will take my seat. Just a few quick points. Judge Davis, going back to this idea of who has the burden, I think it can't just be common sense. The two cases I would point you to are Barr and Castorina. Castorina talks about how it refused to uphold a restriction of the Confederate flag under the Tinker Standard because there was absolutely no evidence in the record. By contrast, in Barr, they upheld it because there was a litany, example after example, of racial hostility happening at the school. The school district just came up and said they have no evidence of this ever causing a substantial disorder and it's not surprising because they didn't put anything in the record. Below in the preliminary injunction hearing, that is their burden under Tinker. When the government wants to restrict speech, that is their burden, not our burden to come forward and disprove this. Judge Batchelder, on the accommodation question, the accommodation that they're offering isn't really an accommodation. They're just saying don't use pronouns. If you look at Meriwether, Meriwether has a long discussion where it talks about the importance of pronoun usage in this heated debate that is happening across the country. There is one side and there is another side. The accommodation that the school is offering is just don't talk about it at all, period. That's not an accommodation. Third, I would just like to highlight the danger of the district court's opinion here. What the district court said is that a school can compel speech as long as it's reasonable. That's basically what the district court said. But the next school district that can come up from Tennessee or Kentucky or wherever could do the opposite policy. They could say every student must refer to another student by biological pronouns. Meriwether warned of this. Under the district court's reasoning, a school district could come up with the exact same rationale for why it needs to force students to speak one way or the other. The reality is that the First Amendment doesn't prohibit any of it. The First Amendment says this is the type of thing that is left to the marketplace of ideas. It's left for students to discuss except when the school comes up and proves and shows evidence that it can restrict speech under Tinker or it can restrict speech under any of the four narrow carve-outs that the Supreme Court just talked about in Mahanoy. So again, going back to the overbreadth, nobody is saying that the school district can't ensure a safe and healthy environment for students, but it can't do what it did here, which is enact a sweeping broad policy prohibiting any speech without coming forth with the evidence and the proof that is needed for the government to carry its burden here. Thank you very much.